This next case is case number 4-17-0368. In re Marriage of Goebel. And appearing for the appellant is attorney Ruth Wyman. And for the appellee is attorney Scott Dempsey. Good morning. Good morning. Ms. Wyman, are you ready to proceed? I'm ready. You may. May it please the court, counsel. This is an issue about a premarital or prenuptial agreement and the validity of that agreement signed in Brazil several weeks before the party is married. There are several issues, both technical and then with regard to the validity of this agreement, the circumstances under which it was signed. With regard to the prenuptial agreement that was attached to the complaint for declaratory judgment filed by Raquel Castro Goebel, the petitioner in this case, on April 15, 2016. Her complaint for declaratory judgment, as the court will note and as the brief references, there is the petitioner appellee Raquel Castro Goebel signs the verification and alleges that or states that the prenuptial agreement signed by the parties is attached, the true and exact copy is attached as Exhibit A to the complaint. It's in Portuguese. There's a translation. They're not certified. What is significant and substantial about this document is that the document that was attached to the complaint and stated by, verified by Raquel to be the true and exact copy of the prenuptial agreement is not signed by either party. The James attorney filed a motion to dismiss that because as the court knows and the statutes require, a prenuptial agreement has to be signed by both parties. It wasn't. So the court granted that motion to dismiss. And then Raquel filed an amended complaint for declaratory judgment with a different document, one that was now signed by both parties and attached to the amended complaint. The problem with that is, of course, that the original document unsigned by either party is a judicial admission. And that... What does that mean? What do you mean? How is the document a judicial admission? Well, in the complaint, the complaint says that she has attached or it states that they, that Paragraph 2 on January 29, 2003, Petitioner Raquel Castro-Gobel and Respondent James William Frederick-Gobel entered into a prenuptial agreement on universal community of property in the city of Fortaleza, capital of the state of Sierra, Federal Republic of Brazil, a copy of which is attached here too as Exhibit A and incorporated herein by reference. So that then is an admission that that is the document that they entered into. However, that's unsigned. Is it different from the signed one that was later presented? It is different in that there's now signatures on this amended one. The one that was attached to the original complaint... Well, that was my question. Okay. Is it the same as the earlier one except now there are signatures? That's correct. So then what's the issue? Well, I believe that the act of stating that the complaint, or sorry, attaching to the complaint one that is unsigned and saying that this is the actual, this is the copy of that and then coming back once that's dismissed and saying, oh, well, no, here's one that's actually signed. I understand and... Admission of what? What did they admit? Well, they admitted that what she's saying is that the prenuptial agreement in her complaint was unsigned and an unsigned prenuptial agreement, this is, an unsigned prenuptial agreement would be invalid. But there are additional arguments if the court does not agree with that argument that the court erred in allowing and accepting the prenuptial agreement that was signed and attached to the amended complaint. Ms. Weinman? Yes. May I ask a question in regards to the record? Mr. Dempsey indicated in his brief for the petitioner that the record is incomplete, that it is missing a transcript of proceedings from February 21, 2017, that this was a three-day trial, the record only contains transcripts of proceedings for the first two days of trial. Was there a third day of trial on February the 21st? I believe so. And after reviewing the brief by Mr. Dempsey, I see that the notation of that a transcript was prepared and that there was a hearing was indented. I missed that and I apologize for that. So there was a missing transcript, there is a missing transcript. But I believe the record and the facts sufficiently show that the prenuptial agreement is invalid and should not have been accepted as the prenuptial agreement of the parties. There's additional issues, as were mentioned in the brief. Well, how can we know that if we don't have the transcript from the third day? Sure. For one thing, the document that was attached to this amended complaint, and frankly the one that was attached to the original complaint, was never translated. So it was only in Portuguese and never translated. The document, which is translated in English, and one of the witnesses for Raquel testified that it was a true and accurate translation of the document he was provided by her, does not disclose property, what the property is of either of the parties. There is no disclosure or nothing in writing expressing an agreement to say that we will not disclose it. Some of those basic requirements under the Prenuptial Agreement Act or under the statutes that are required, whether you have testimony or not, it's clear that there is nothing in these documents, either the original document filed with the complaint or the amended, or the other document filed with the amended complaint. There is no disclosure of assets. It's only in Portuguese. The document that translates the prenuptial agreement was only translated into English for the court trial, so upon the petitioner's decision to file for divorce. And again, it says that this is an agreement on regime of universal community properties, but it doesn't disclose, again, what's going to happen with that, which is a requirement of the Uniform Prenuptial Act. As Mr. Goble testified, he thought, going one or two weeks before the wedding for the parties, that what he was signing was a marriage license. That's what Raquel told him. You're going to, we're going to go sign a marriage license, and they went, and the guy stands up and speaks in Portuguese and reads this, and both of them sign it. That's what he understood. There was no mutual assent, because he didn't understand that he was signing a prenuptial agreement. He thought he was signing a marriage license. Is that a factual finding? That was, I believe that was a factual, that was.  It was testimony and evidence presented by James Goble, and I don't believe that the court agreed that that was or relied on that testimony of Mr. Goble in making its finding that the prenuptial agreement or amended prenup, sorry. Well, the reason I ask is with regard to the third day of trial, it would be, it certainly wouldn't be uncommon for the trial court at the conclusion of the trial to have stated the court's analysis and thinking, possible findings of fact, and its ultimate reasoning. I understand. You haven't provided that to us. I understand that, and that was error on my part, and I apologize. This was a trial that was first started by Judge Blockman, then concluded by Judge Rosenbaum, in these proceedings, but the documents in and of themselves provide evidence, I believe, that show that the document should not have been accepted by the court, because there was no mutual assent. So we don't need to know what the trial court said about any of this at the conclusion of this three-day trial? None of it could possibly matter? Is that your argument to us? Well, I think that the documents, that it could matter, but not enough to affirm the trial court, because the documents in and of themselves fail to meet the requirements, the statutory requirements. They do not disclose the property or the financial assets of the parties as required. There's no voluntary or express waiving of the right or the disclosure property as required, and there was no adequate knowledge of the property or financial obligations of the parties. And so for those reasons, the court's decision or the court's ruling should be reversed. There is also the affirmative defenses of fraud, duress, and coercion, and the unilateral mistake of fact, that being the fact that Raquel, in Brazil, and when they went to sign these documents and got married, she was a lawyer, certified, and was a lawyer who was licensed to practice in her state and in Brazil. James was and is a U.S. citizen and had just graduated from Illinois State with a social sciences degree. He had learned some Portuguese but wasn't fluent at all. And so when Raquel tells him, oh, we're going to do this, we're going to just go sign this marriage license, that's what his understanding is based on speaking with Raquel, who is a lawyer, and who never told him, oh, go ahead and review this with any attorney. And so for those reasons, we would ask that the court reverse the trial court's ruling and determine that the prenuptial agreement was not valid or enforceable. Counsel, I have a question about jurisdiction. I noticed that the original order from the trial court made a 304A finding specifically in writing. Then there was a motion to reconsider, and following the motion to reconsider, there's a docket entry that says, order is modified to reflect that the premarital agreement is valid and enforceable. There's no mention of a 304A finding in the modified order, which is simply a docket entry. Why do we have jurisdiction without such a finding by the trial court? Well, I believe that the original finding before Raquel's motion to reconsider granted that jurisdiction and the finding or the modification by the trial court on the motion to reconsider, there wasn't a request to reconsider that ruling for a 304A finding. It was a motion to reconsider sort of the substance of that ruling. So when there's a 304A finding by the court, and then there is a motion to reconsider, and the court does reconsider and modifies the prior order, are you suggesting that an additional 304A finding is not necessary? And if so, do you have any case law that says that? I'm suggesting that that is the case, but no, I'm sorry, I do not have any case law. The modification was pretty significant, was it not? Oh, it was very significant, yes. It was, in fact, the crux of the case. It changed everything. With regard to inheritance. Right. And the trial court originally made a finding on that. That's right. Then when it modified, it took away the inheritance question and simply left this court with potentially a review of whether the prenuptial agreement applied, right? That's correct, yes. And the only significance of the prenuptial agreement is the inheritance, as I understand it, from reading this record. Right, and that's certainly our biggest concern. That's correct. Therefore, it leaves me the question, since the court made this major modification to the original order, which had the 304A finding, wasn't it incumbent upon the court to make another 304A finding to allow this court to have jurisdiction? Otherwise, it's just a waste of our time, isn't it? I would never suggest that it's coming. It's a waste of your time. I understand your question and your issue. And I'm sorry, I don't have case law to do that. It was our belief, certainly in filing the appeal, that the modification was to the court's ruling and did not disturb the 304A finding. But I'm sorry, I have no case law on that issue. And I don't know if Mr. Dempsey. Should this court rule against you in this appeal? Aren't we in the same position as we were before the appeal? We know that there's a prenuptial agreement, but we don't know if it makes any difference because there's been no finding on the inheritance. Is that right? That would be right. I think one would assume it would make a difference. Otherwise, no one would have appealed, probably. But there's no factual finding that says this would make a difference. And I suppose the court could return it, say, you know, you didn't make a 304A finding until there's a 304A finding on this modified response on this one issue. The court would need to do so. Did the court, when the hearing was held on the motion to reconsider, talk about a 304A finding, an additional one? I wasn't present personally. I don't recall anything in the transcripts discussing that. I know Mr. Dempsey was present personally, and I'm sure we'll speak to that question, but I don't specifically recall in the transcripts there's any discussion of the 304A finding in that motion to reconsider. Okay. Thank you. All right. Thank you, Ms. Wyman. Thank you. Mr. Dempsey. May it please the court and counsel, to touch on the last issue that the court addressed, I don't believe that the post-trial motion to modify the court's original memorandum of opinion significantly changed the court's ruling in this case. The significant ruling from the initial order was the court granted the complaint for declaratory judgment. Speak up again. The significant ruling was what? It was paragraph A of the court's order from its memorandum of opinion, granting the amended complaint for declaratory judgment. So if you look at what the amended complaint and the original complaint asked for, it was simply a declaration that that party's prenuptial agreement was a valid and enforceable agreement, which is a proper subject for a complaint for declaratory judgment. What the court did, and what we pointed out in our post-trial motion, is the court went beyond simply declaring that that was a valid and enforceable agreement and trying to interpret that agreement in the context of the plaintiff. Then why did you plead all of the facts regarding inheritance, unless you wanted the court to give a construction of the contract? Well, I don't think those were necessarily pled. I think those were issues that the court inquired about during the course of the proceedings. They weren't in the pleadings? No. I think the complaint for declaratory judgment simply indicates the parties have a valid and a... Is that the original one or the amended one? I think both of them. The two complaints were essentially identical. I guess it does talk about the prenuptial agreement did not provide a clause that excluded property donated or inherited from becoming marital property. There's no reference to the specific issue in the case, which is really the only asset of these parties' divorce, is that during the course of the marriage, while they were still married, the respondent's mother died. There was an estate that was opened up in Peoria County, and that estate has basically been dormant because there are assets of that estate, real estate, and nothing's really happened with that. So that's really the only asset of the case. So during the course of the trial on the amended complaint for declaratory judgment, the court started hearing testimony from the parties and heard that really there's not much in this divorce case. So really, what are we fighting over? Why are we having an extended hearing on a complaint for declaratory judgment when neither of these parties have really substantial assets? And that's how that came up. And I think if you look at the hearing on the motion to modify the court's judgment, the court indicated based on its prior experience in the Carl Foundation litigation that it was cognizant that you're not supposed to go beyond the bare issues in the complaint for declaratory judgment, and the sole issue that was raised is whether or not this was a valid agreement or not, not how that impacted this litigation. Ultimately, that's what the issue is going to be. Well, then that leads to the question, why not a 304A finding in the modified order then? I think the court simply restrained itself from the original judgment. You know, counsel, the reason I ask is this court wrote a very lengthy memorandum of opinion, well-written, took a lot of time, made sure to cover all the bases. And by the way, in it, the court indicates that if valid and enforceable, this court may make binding declarations of rights, including the construction of any contract. Then in the modification, there's just one short sentence in a docket entry, basically saying that, I guess, Clause A in the order remains, but it doesn't say anything about the 304A finding. But also in the memorandum, there's a whole section on inheritance. Did the court strike all that as well? That's in its findings of fact. I think the significance is in the order, because ultimately that's what the court's determination is. What it says in the order is that the complaint for declaratory judgment is, in fact, granted. So I think the court simply recognizes it went beyond the scope of what it was being asked to do on the amended complaint for declaratory judgment and clarified what this order was. So there's no explicit indication from the court at the hearing on the motion to modify the judgment that those portions of its findings of fact were being stricken. But the significance is that the court granted the complaint for declaratory judgment. And what the petitioner was asking for was that the court determine that the party's prenuptial agreement was a valid enforceable agreement, and that's the only thing the court should decide at that stage of litigation. It was repeatedly brought up during the course of the case that we're not getting into how this prenuptial agreement affects these parties. Again, that's for the hearing on ancillary issues. The very reason why we're having a hearing on... Well, how did the court get so confused and then write this whole section on contract construction if it was clear that the only question was whether there's a prenuptial agreement that's enforceable? I don't know how the court got confused because I think we made it clear in the transcript that the only issue the court should be deciding at that point is whether or not this is a valid agreement. Because how this agreement affects the division of property, there was absolutely no evidence whatsoever presented on that. The only thing that was discussed during the hearing was from the attorneys what our understanding of the statutory schemes in Brazil are. That's not evidence. So there was simply no basis in the record for the court to go beyond deciding that this is a valid prenuptial agreement. Regarding this subject that Justice Turner has raised, was this matter something which the trial court may have discussed on the mysterious third day of evidence and then the rulings of the court? I believe, as I recall, it was a lot sooner than that in the litigation. I think the court got the gist of the fact these parties really had no property. I'm just wondering, though, when this is all over, if the court had occasion... That's typically when trial courts kind of wrap everything up, including maybe the very point that you're now talking about. No. As my recollection was, it was earlier on in the proceedings. I think the court had an understanding that these parties really didn't have a lot of property and wanted to know what we were fighting over. But the last day, I think, is concerning because that is the bulk of the respondent's testimony was on the last day. If you look at the end of the transcript, I think we were just starting on his testimony. I'm curious, as was the trial court, to the question you just raised. These parties don't have a lot of property. What is this case all about? Who cares? Why does it matter? It's about... And we're spending all this time and effort. I hate to think about the money cost here. What's going on? Well, I think from our perspective, Your Honor, we know that during the course of the marriage, the respondent's mother died in Peoria County. There was enough of a state that he went to court and was appointed administrator of the estate. She died without a will. That was several years ago. For some reason... His mother? His mother, yes. Yeah, there's at least $100,000 in the estate. Correct. We know there's real estate involved in this. The respondent has not been forthcoming with why he's not moved forward to close the estate. The only thing that's happened in that estate is he was appointed administrator. No accounting has ever been filed in the estate. Nothing has ever been done since he was appointed. I believe it was in 2015, and he's not taken any steps whatsoever to close the estate, which I think... But he has taken disbursements of about $40,000, right? Yeah. I mean, apparently he's been taking disbursements, not filing any accounts in the estate case. So that's one of the reasons red flags from our perspective that we took... Okay. And the court's original order here disposed of that. It was dispositive. It said there's no inheritance right. The inheritance is not going to become marital property. Then there's a petition or a motion to reconsider, and it's really significant because it wipes that away. And so now, if you win, we're left with this prenuptial agreement that's enforceable, but we have no idea whether it makes any difference at all. Right. And that's what the hearing on ancillary issues are because the significance is your testimony... Well, the hearing on ancillary issues is to divide the property. Great. And how the party's prenuptial agreement relates to the property that they have. So there was testimony from Raquel Gobel that there are three different regimes in Brazil that you can opt into. Everyone has to enter into a prenuptial agreement. There's three different regimes you can enter into. What is the significance of the universal community property regime versus opting into simply community property regime or the regime that's more similar to what we do under Illinois law, which is an equitable division? Well, just to get right down to it, the court is well aware that the argument, the trial court, is going to be that the inheritance goes to the marital portion of the estate unless there's a clause from the donor that says it doesn't. And we have no will here. So there's no such clause. Well, there's a statute of dissent and distribution. The inheritance happens for a reason. And the court was aware of that. Right? And yet you're saying that the court intended for this to be appealed under 304A in spite of the modification, I guess. Correct. I believe that that is correct. But what the impact, there was no evidence presented on what this particular regime means and how that should be applied to the facts of this case. And I believe it was the respondent objected to any attempt in this case to present evidence about what the universal community property regime meant in Brazil and said, well, that's a subject that requires expert testimony. And my client being an attorney who's licensed in Brazil, I believe, could have presented that testimony. But when we went in that direction, the respondent objected. And it was, I think, discussed at that point that really the issue is not what that regime means, how it gets applied to the facts of this case. That's for a later day. Really, the only issue in the complaint for declaratory judgment is whether or not this is a valid enforceable agreement. And I think it is significant that the only requirements under Illinois law for a prenuptial agreement are that it be in writing, that it be signed by the parties. And that's what we have in this case. And the significance of both the original complaint and the amended complaint is that in Brazil, the signed document is not a matter that's made a public record. So the signed prenuptial agreement the parties enter into gets filed in office, and then you have an official declaration that these parties entered into a prenuptial agreement and selected this particular community property regime. That's the official document that is available to the public. So that's what was attached to the first complaint for declaratory judgment. Eventually, the signed document that was signed by both the petitioner and the respondent was produced, and that's what led to the amended complaint for declaratory judgment. So the basic requirements under Illinois law for a valid prenuptial agreement are met. We have a signed document, and it is in writing. Again, it's the same requirements under the Hague Convention. There's an argument raised in the appellant's brief that this prenuptial agreement doesn't satisfy the requirements of the Hague Convention. Walk me through that. I was kind of lost, and I read both briefs. What is that argument, and what's your response about the Hague Convention? The only argument that I can get is that for some reason it doesn't apply with the Hague Convention, but since this is an international divorce where the agreement was entered into another country, you have to apply not only Illinois law, but I believe it's the appellant's argument that you have to follow the requirements of the Hague Convention. This is a federal treaty that would preempt and supersede Illinois law on this subject. But as I read the requirements of the Hague Convention, the Hague Convention requirements for prenuptial agreement are essentially identical to the Illinois requirements under the Uniform Illinois Prenuptial Agreement Act that be signed and be in writing. So I think those are satisfied. I don't think that's really… Did the court make that finding? I believe that it touched briefly on that. Yeah, there's a paragraph on page 6 of the court's order where it talks about the Hague Convention, and again said that it was in writing, it was dated and signed by the parties, so it didn't really seem to be any issue. That was really more of an admissibility issue I think that was raised by the appellant, was that this shouldn't be admissible because it doesn't apply with the Hague Convention, which, again, I think that goes to enforceability. It doesn't deal with admissibility. I think admissibility is governed by Illinois law on that, and there's an argument raised by the appellant that under Rule 902, subparagraph 3, that somehow this agreement was not properly admissible because there was no apostille  This is a contract. Contracts can be admitted by a party to the contract, laying the proper foundation for that. We have both of the parties in this case ultimately admitted that they signed that document. The appellant admitted that that was his signature on the document, despite previously saying that he had not signed it. During his testimony, he admitted, yeah, I signed it. And so Rule 902.3 of the Illinois Rules of Evidence really simply is not even applicable to this case because, again, that deals with omissions of documents signed by foreign officials in their official capacity. That's not what this is. There's no signature on this prenuptial agreement from any sort of foreign official. This is simply a contract between these parties like any prenuptial agreement is that was signed by both parties. The fact that it was recorded at a notary's office in Brazil has no independent significance. It's like a deed. You can go to a recorder's office in Illinois and get a certified copy of a deed to have that deed admissible in court. You can have the person who signed the deed come to court and talk about the fact that that's their signature and they recognize that document. There's multiple ways to lay a foundation for agreements, and you're not bound to strictly follow one specific mode of admitting a document into evidence. So 902.3 simply has no bearing on this case. Getting back to the response or the appellant's argument on unconscionability, that's really what the appellant is arguing that this agreement should not be enforced because it's unconscionable, and the specific requirements for unconscionability are stated in the Illinois Uniform Prenuptial Agreement Act. And, again, that requires a finding by the court on the issue of credibility of the parties to a great extent. And if you look at the court's memorandum of opinion, the court certainly came down on the side of the petitioner when it came to the issue of credibility. I think most importantly, the court found that Mr. Goebel said, oh, yeah, I wouldn't sign a document I didn't understand. So he made this big claim that he didn't understand fortunes, he didn't know what he was signing, that he was led to believe this was a marriage license that he was signing. He testified that he normally doesn't sign documents he didn't understand. These were factual determinations made by the trial court that he simply was not a credible witness. Those are not the types of decisions that this court should overturn, not having the benefit of being able to see Mr. Goebel testify, see Mrs. Goebel testify. There's no requirement under the Illinois Uniform Prenuptial Agreement Act that any disclosure of assets be in writing. You can have an oral disclosure of assets, and certainly this agreement did not have a written disclosure of assets, but you have to satisfy all three requirements under Section 7A2 of the Illinois Uniform Prenuptial Agreement Act for a court to find that an agreement is unconscionable. The person seeking to void the agreement has the burden of proof on that issue. And so the court found that both parties had fair and reasonable disclosure of the property or financial obligations to their party. Both parties knew that by the time they got married, neither party had really any significant assets. They knew that neither party had anything. Certainly there was no voluntary express waiver of the right to disclosure, but certainly Mr. Goebel could have done due diligence. There was nothing preventing him from trying to find out if Mrs. Goebel had some assets that she was hiding from him. They were together in Brazil. They talked about their finances. So there simply was no basis to find that this agreement was unconscionable. And likewise, there really was no evidence on the other affirmative defenses that were raised by the appellant, in this case of fraud, coercion, duress, unilateral mistake. Unilateral mistake was not even raised as an affirmative defense in the trial court. It was not pled. I believe that defense has been waived. And there was no evidence of fraud. There was no evidence by clear and convincing evidence that Mr. Goebel was somehow misled by my client. There was no evidence of coercion or duress in that Mr. Goebel was under such stress that he lacked the ability to know what he wanted to do. Somehow he couldn't stop himself from signing this agreement. Those are all affirmative defenses that simply failed in this case. So, Your Honor, I believe there's simply no reason why the court should not affirm all of the trial court's rulings in this case or amend this case for further proceedings so we can then get to the issue, unanswered issues of how this valid prenuptial agreement actually impacts this case and how that should be analyzed depends on what the assets are at that time. All right. Thank you.  Touching on a few of the issues that the court raised in questions with me and with Mr. Dempsey, the transcript of July 3, 2017 on the motion to reconsider starting at R406 and going through R445, there's no discussion at all in any of that of making it 304A, as Justice Turner had asked about, and, of course, as I think the court noted, there's nothing in the docket about that issue. The prenuptial agreement, as we have argued, was unconscionable, and there wasn't anything in writing that was submitted that shows that there was a disclosure of property or waiving what that property was or what those financial obligations were. And that is one of the requirements, one of the statutory requirements. As I noted, Mr. Goble had testified that he believed that he was going to sign a marriage license. That's what Raquel told him. And so there was no meeting of the minds. There couldn't be a meeting of the minds because he didn't understand and wasn't told. Not only was he not told he was signing a prenuptial agreement, he was told that he was signing a marriage license, something that would make sense to an American that you need to sign a marriage license and not something, this other document that was in Portuguese and, again, not translated until the divorce proceedings were started by Raquel. For those reasons, we would ask that the court reverse the trial court's amendment and docket entry made modifying the memorandum. Thank you, Ms. Bynum. Thank you both. The case will be taken under advisement and a written decision.